IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| WILDERNESS WATCH & FRIENDS OF THE CLEARWATER,<br><br>Plaintiff,<br><br>vs.<br><br>JULIE KING, Supervisor of the Bitterroot National Forest; FAYE KRUGER, Regional Forester for Region One of the U.S. Forest Service; and the UNITED STATES FOREST SERVICE, an agency of the U.S. Department of Agriculture,<br><br>Defendants. | CV 12–102–M–DWM<br><br><br><br>ORDER |

## I.    Introduction

Wilderness Watch and Friends of the Clearwater have sued the United

States Forest Service, Julie King and Faye Kruger in their official capacities as

Supervisor of the Bitterroot National Forest and Regional Forester for Region 1,

respectively. The case seeks to prevent the use of a helicopter for the Fred Burr

High Lake Dam Access for Repair Project. They allege violations of the

Wilderness Act, the National Environmental Policy Act (NEPA), and the National

Forest Management Act (NFMA).

## II.      Factual Background

### A.      The Project

The Selway-Bitterroot Wilderness encompasses 1.3 million acres. The Wilderness was established by the Wilderness Act of 1964 and includes pockets of dense old growth cedar forests, a number of plant and animal species, and an extensive trail system. 508,000 acres of the Wilderness are within the Bitterroot National Forest. The entire Wilderness falls within Bitterroot National Forest Plan Management Area 7c.

The Fred Burr Creek drainage encompasses 11,523 acres, 6,460 of which are in the Wilderness. The Fred Burr dam is located within the Fred Burr drainage, approximately 6.8 miles inside the Wilderness boundary and roughly 11 miles from the trail head of Forest Service Trail #38. The last mile of trail to the dam and reservoir rises 1,000 feet in 35 climbing turns.

 The Fred Burr dam is classified as a low-hazard dam with a deteriorating catwalk and log boom.[1] The dam was constructed in 1914, under a special use

---

[1] The classification of "low hazard" means that the dam may cause damage to some buildings, agricultural lands, or minor roads in the case of breach (as opposed to a "high hazard" dam which could potentially result in the loss of life, main highways, and residences). A log boom is a barrier that is placed in the water to protect the spillway.

permit, and then reconstructed in 1922 when the reservoir was expanded from 12 to 15 acres. In 1972, the dam owners constructed a new catwalk, repaired the outlet gate structure and inlet and cleaned the spillway of debris, with no reference to use of motorized or mechanized means. In 1973, the Forest Service denied the dam owners helicopter access to close the dam headgate, even though personnel had attempted to reach the dam on foot and had failed due to difficult snow conditions and weather that posed a safety concern. In 1990, the Forest Service authorized the dam owners to install a water measurement device for the purposes of documenting their water right. That flume, hand tools, and other installation equipment were to be carried in to the project site by pack animals, and the project crew was to be transported by saddle horses.

In 1996, the District Ranger authorized use of a helicopter to transport personnel and equipment for dam maintenance because the dam owner's son had been injured in a riding accident and the dam owner could not be away from home for the three days traditional maintenance would require. In 2002, the District Ranger provided a limited authorization to the dam owners to use a chainsaw to cut up a water-soaked log that was obstructing the spillway to the dam. That letter specifically stated that the chainsaw could not be used to reconstruct the log boom.

In this case the Forest Service authorized Fred Burr High Lake Inc. two

helicopter flights into the Wilderness to fly materials for dam repairs into the dam facility.[2] In August 2010, FBHLI made a request to District Ranger Dan Ritter asking for approval to rebuild the ramp to the dam headgate and replace the log boom. Its proposed design for the catwalk consisted of the use of a prefabricated, 17-foot long ramp and two sets of supports, one 15-feet tall and one 3-feet tall. A Forest Service engineer estimated the approximate total weight of the ramp, supports, and other proposed project materials to be hauled in to be between 591 lbs. (welded) and 682 lbs. (in pieces). The action proposed to the Forest Service sought one helicopter over-flight that would last about 45 minutes. The helicopter would not land within the Wilderness. In addition to the catwalk, the helicopter would deliver 30 feet of cable for the replacement of the log boom. Once the materials arrive, workers would travel by foot or stock to the site.

The Forest Service issued the Project Environmental Assessment (EA) in April 2011. In July 2011, the Forest Service issued a Decision Notice and Finding of No Significant Impact (FONSI) and adopted FBHLI's proposal to use a helicopter to bring a cable and catwalk to the dam site. Plaintiffs filed their Complaint on June 15, 2012. Also on June 15, 2012, the Forest Service issued an

---

[2] While the entire project could be completed in the course of one flight, the Forest Service authorized two flights out of concern that a second might be necessary in the event of unexpected contingencies during the first.

easement to FBHLI under the provision of Public Law 99-545 (the "Ditch Bill Act"). Before the filing of Plaintiffs' complaint—and when the Forest Service performed its analysis—the dam was authorized under a special-use permit.[3]

## B.    Procedural History

The Complaint in this case was filed in June 2012. Plaintiffs moved for a temporary restraining order as well as a preliminary injunction shortly after filing. The temporary restraining order was denied and the parties stipulated to withdraw the injunction. As part of the stipulation, the Forest Service agreed to provide Plaintiffs 30 days' notice prior to commencement of the Project. The parties briefed and submitted Motions for Summary Judgment. The Plaintiffs recently renewed their Motion for Preliminary Injunction after the government provided notice, in accordance with the stipulation, that the Project was slated to begin in mid-July 2013.

## III.   Standard of Review

## A.    Summary Judgment

A party is entitled to summary judgment if it can demonstrate "that there is no genuine dispute as to any material fact" and they are "entitled to judgment as a

---

[3] Plaintiffs failed to file a Statement of Genuine Issues as required under L.R. 56.1(b). Defendants filed a Statement of Genuine Issues, stating that "there are no genuine issues of material fact" as all facts are contained in the administrative record.

matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). On a motion for summary judgment, this Court must determine whether a fair-minded jury could return a verdict for the non-moving party. *Id.* at 252. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment; factual disputes which are irrelevant or unnecessary to the outcome are not considered. *Id.* at 248.

## B.    Administrative Procedure Act

Courts review claims regarding the Wilderness Act, NEPA, and NFMA under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176 (9th Cir. 2011) (NEPA and NFMA)*; High Sierra Hikers Assn. v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004) (Wilderness Act). Under the APA, a "reviewing court shall hold unlawful and set aside agency action that is . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The scope of review is narrow, and the court will "not substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Gardner v. U.S. Bureau of Land Mgt.*, 638 F.3d 1217,

1224 (9th Cir. 2011). A decision is arbitrary and capricious:

> only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Gardner*, 638 F.3d at 1124.

An agency's actions are valid if it "examine[d] the relevant data and articulate[d] a satisfactory explanation for its actions including a rational connection between the facts found and the choices made." *Id.* (citation and internal quotation marks omitted). Review of the agency's action is "highly deferential, presuming the agency action to be valid." *Buckingham v. Secy. of U.S. Dept. of Agric.*, 603 F.3d 1073, 1080 (9th Cir. 2010) (quoting *Irvine Med. Ctr. v. Thompson*, 275 F.3d 823, 830-31 (9th Cir. 2002)). However, this presumption does not compel courts to "rubber stamp" administrative decisions "they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A.*, 464 U.S. 89, 97 (1983) (internal quotations omitted). As long as the record supports the agency's decision, that decision should be upheld even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91, 112-13 (1992).

**IV.    Analysis**

    **A.    Wilderness Act**

Plaintiffs insist that the Project violates the Wilderness Act. They argue the limited Project fails to preserve the area's wilderness character, the Project is not necessary for administration of the area, and that the Project lacks a Wilderness Act purpose. They also challenge the Project on the grounds that it exceeds the minimum requirements necessary and claim that helicopter access is not customarily enjoyed by similarly situated occupancies.

These arguments are unpersuasive in light of the special treatment of the dam and reservoir under the applicable statutes and regulations and the limited and comparatively sparse impact the Project will have on the area's wilderness character. The Project, as proposed and authorized, is the option which least disturbs the area's wilderness character. Helicopter access is permissible as customarily used for occupancies similarly situated. It is difficult to imagine any impact, other than momentary, of a helicopter flight lasting less than one hour.

    **1.    Wilderness Character, Administration, and Purpose**

Plaintiffs argue the Forest Service's authorization of a helicopter over-flight as part of the Project damages the wilderness character of the area, in violation of the Wilderness Act. They argue the Project undermines wilderness administration

requirements of promoting and perpetuating values of solitude, physical and

mental challenge, scientific study, inspiration, and primitive recreation. *See* 36

C.F.R. § 293.2 (outlining the objectives of wilderness administration). The

government contends not only does the Wilderness Act recognize competing uses,

*see* 16 U.S.C. § 1133, but the proposed one-hour over-flight would actually

facilitate preservation of the area's wilderness character because it furthers Project

objectives critical to the administration of the area as wilderness and its temporary

and isolated nature will have a less significant impact than any alternative. The

tension between these two positions reflects the difficulty the Forest Service

confronts any time an action or a project involves a designated wilderness.

In the EA, use of the helicopter would require less present and future trail

improvements and trail use, and permit maintaining the current trail classification.

In contrast, for the packstock alternative, the Forest Service found:

> [it] would involve extensive work in the 1.5 miles of trail below the
> dam including spot blasting in the climbing turns in order to provide
> safe access for packstock transporting catwalk and log boom
> equipment. A large portion of the trail work needed in alternative 3
> would be irreversible and diminish the unmodified natural
> environment prescribed in the Selway-Bitterroot General
> Management Direction for this area . . . .

(Decision Notice at 13.) The Forest Service's determination that a helicopter flight

would preserve wilderness character better than the packstock alternative is

supported by the Act's directive to both leave the land "untrammeled" and ensure that man "is a visitor who does not remain." *See* 16 U.S.C. § 1131(c). The same argument also applies to the no action alternative, which could result in "overtopping [or] failure of the embankment[,]" potentially causing a breach of the dam and concomitant "massive erosion and turbid waters," which would permanently degrade the area's wilderness character. (EA at 5, 13.)

While the Selway-Bitterroot Wilderness Plan acknowledges "[l]ow level flights by aircraft create a disturbance which is not compatible with a wilderness experience," this does not overcome the Forest Service's decision that a helicopter provides better long-term wilderness character preservation in this situation. A similar situation was considered in *Wolf Recovery Found. v. United States Forest Service*, 692 F. Supp. 2d 1264, 1268 (D. Idaho 2010). There, Judge Winmill determined that even though helicopter use is incompatible with the wilderness experience, where the ultimate goal is restoration and protection of a key component of the wilderness, such helicopter use is necessary for the administration of the area and does not violate the Wilderness Act. *Id.*

To overcome the restrictions on motorized use explicitly outlined under the Act, the use of the helicopter must be "necessary to meet minimum requirements for the administration of the area . . . ." *See* 16 U.S.C. § 1133(c). The government

contends that helicopter access complies with the Wilderness Act because (1) the prevention of dam breach is a valid "purpose" under the Act and (2) the Forest Service adequately determined that helicopter use is necessary to meet the minimum requirements for administering the area.

When evaluating challenged agency decision making, the first question to decide is whether Congress has spoken directly and unambiguously to this precise issue. *Chevron, U.S.A., Inc.*, 467 U.S. at 842; *Wilderness Socy.*, 353 F.3d at 1060. If the statute is silent or ambiguous regarding this issue, deference to the agency is appropriate so long as "the agency's answer is based on a permissible construction of the statute," *Chevron,* 467 U.S. at 846, and their statutory interpretation has the force of law, *Wilderness Socy.*, 353 F.3d at 1060; *Mead Corp.*, 533 U.S. at 228.

If a statute is clear and unambiguous, no deference to an agency's interpretation is required and the plain meaning of the statute is enforced. *Chevron*, 467 U.S. at 842-43. If the statute is ambiguous, deference to an agency's interpretation is due under *Chevron* only if the agency interpretation has the force of law. *Mead*, 533 U.S. at 228. "The weight [afforded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking

power to control." *Id.* (internal quotation marks and citation omitted). If the

decision does not have the force of law, it may still be entitled to "respect"

according to its persuasiveness. *Id.* at 235 (citing *Skidmore v. Swift & Co.*, 323

U.S. 134, 140 (1944)); *see also High Sierra Hikers Assn.*, 390 F.3d at 638-39;

*Wilderness Socy.*, 353 F.3d at 1067.

The Forest Service was not mistaken when it determined the Project serves

a valid Wilderness Act purpose. Its decision is consistent with the plain meaning

of the relevant statutes and is neither arbitrary nor capricious. The Wilderness Act

has a broad statement of purpose:

> In order to assure that an increasing population, accompanied by
> expanding settlement and growing mechanization, does not occupy
> and modify all areas within the United States . . . leaving no lands
> designated for preservation and protection in their natural condition,
> it is hereby declared to be the policy of the Congress to secure for the
> American people of present and future generations the benefits of an
> enduring resource of wilderness.

16 U.S.C. § 1131(a).

Under the Wilderness Act of 1964, "wilderness" is defined as "an area

where the earth and its community of life are untrammeled by man, where man

himself is a visitor who does not remain." 16 U.S.C. § 1131(c). Areas designated

as wilderness pursuant to the Act must be managed to preserve their "wilderness

character." *Id*. § 1133(b). Some activities, including the use of motor vehicles,

motorized equipment, and other forms of mechanical transport, are banned by the

Act, "except as necessary to meet minimum requirements for the administration of

the area for the purpose of this act." *Id.* § 1133(c). This general provision is

coupled with a specific right of adequate access to privately owned land

completely surrounded by areas designated as wilderness. *Id*. § 1134(a).

Furthermore, the Act expressly delegates regulatory authority to effectuate access

to occupancies in wilderness areas:

> In any case where valid mining claims or other valid occupancies are
> wholly within a designated national forest wilderness area, the
> Secretary of Agriculture shall, by reasonable regulations consistent
> with the preservation of the area as wilderness, permit ingress and
> egress to such surrounded areas by means which have been or are
> being customarily enjoyed with respect to other such areas similarly
> situated.

*Id.* § 1134(b). While § 1133(c) provides an exception for activities necessary to

meet the minimum requirements of an area, § 1134(b) empowers the Forest

Service to regulate means of access to occupancies wholly within an area

designated as wilderness as customarily enjoyed in similarly situated areas.

*Clouser v. Espy*, 42 F.3d 1522, 1529 (9th Cir. 1994).

These provisions dovetail with the Alaska National Interest Lands and

Conservation Act (ANILCA), which provides a right of access to private land in

the National Forest system. 16 U.S.C. § 3210(a). The right of access granted by

ANILCA applies nationwide, *Montana Wilderness Assn. v. U.S. Forest Serv.*, 655 F.2d 951, 957 (9th Cir. 1981), and was intended by Congress to extend not only to National Forest lands but also to National Forest lands designated as wilderness. *See* Sen. Rpt. 96-413 at 310 (Nov. 14, 1979).

Forest Service regulations at 36 CFR § 251, subpart D implement the right of access provisions codified in 16 U.S.C. §§ 1134 and 3210. *See* 36 C.F.R. § 251.110, *et seq*. These regulations apply to owners of "non-federal land or interests in land within the boundaries of the National Forest System." 36 C.F.R. § 251.111. The standard for access by means consistent to other occupancies similarly situated is also spelled out by regulation. *See* 36 CFR § 293.13.

The Forest Service is charged with preserving and protecting the wilderness character of the land and this purpose is reflected in the Act's mandate to allow access to the land "consistent with the preservation of the area as a wilderness." 16 U.S.C. § 1134(b). This Wilderness Act mandate is unambiguous, so the plain meaning of the statute must be enforced. *See Chevron*, 467 U.S. at 842-43.

Plaintiffs argue that the Project does not serve a Wilderness Act purpose because it is merely intended to improve a privately-owned dam. The government takes the position that the dam's location, the amount of water it retains, and its precarious state of repair make the possibility of a major flood too great a risk for

the Wilderness and its wilderness character.

Although the primary purpose noted in the EA is to provide access to the dam, it also references any work done on the facility "as necessary to protect the National Forest." (EA at 2). The EA also describes the consequences of possible dam failure or breach, including "massive erosion and turbid waters," (*id.* at 16), "changing stream channels and opening areas to noxious weeds," (*id.* at 26), "heavy sediment deposition and possible scouring," (*id.* at 33), and the adverse effect it may have on fisheries and "wilderness integrity," (*id.* at 68). Further, these streams are listed at critical habitat for bull trout under the Endangered Species Act. Repair of the dam is integral to avoiding these negative consequences affecting the wilderness. Thus, the Forest Service's ultimate finding that maintenance of the dam serves a Wilderness Act purpose is in accordance with law.

In this case use of a helicopter furthers the Wilderness Act's purpose because it is necessary to preservation of the dam and to prevent the negative consequences of its breach. Helicopter access also avoids extensive trail improvements and excavations that other methods of access require. At the same time the existing trail system is left undisturbed and preserved. The Act's purpose is to leave the wilderness "untrammeled by man, where man himself is a visitor

who does not remain." 16 U.S.C. § 1131(c). The helicopter over-flight contemplated by the Project access meets this purpose because it is limited in time and constrained in any physical impact. A helicopter ingressing and egressing with no landing, in less than an hour, is a minimalist intrusion on any suggested wilderness quietude. On the other hand, the packstock and backpack alternatives would result in significant and lasting impacts on the wilderness character of the area. Helicopter access also fits with the Act's aim to protect the wilderness for "future generations." As an alternative with only short-term effect on wilderness, the helicopter overflight, as the agency determined, is more desirable under the Act than the packstock and backpack alternatives, which would result in long-term irreversible effects associated with the necessary blasting and trailblazing.

The agency's reasoned application of the Wilderness Act to the facts of this case will not be set aside. Even though alternative approaches to this question could dictate a different outcome, so long as the agency has provided a "rational connection between the facts found and the choice made[,]" the agency decision will not be disturbed unless there is a "clear error of judgment." *Motor Vehicle Mfrs. Assn.*, 463 U.S. 29 at 43 (internal citations and quotation marks omitted). Because the record supports the agency's decision, that decision will be upheld, even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91,

112-13 (1992). There is no clear error of judgment in the agency's decision making regarding this Project. Helicopter access as authorized under the Project is consistent with the purposes of the Wilderness Act.

### 2. Minimum Requirements

The Forest Service did not violate the Wilderness Act when it found that the Project is necessary to meet the minimum requirements for administration of the wilderness area. Although the Wilderness Act prohibits the use of motorized equipment, there is an exception when "necessary to meet minimum requirements for administration of the area." 16 U.S.C. § 1133(c). In *Wolf Recovery Foundation*, the district court stated that "[i]t would be a rare case where machinery as intrusive as a helicopter would pass the test of being 'necessary to meet minimum requirements for the administration of the area.'" 692 F. Supp. 2d at 1268 (quoting 16 U.S.C. § 1133(c). However, the district court went on to find that the use of the helicopters to collar and track wolf populations was "sufficiently limited and focused on restoring the wilderness character of the area" that it met this requirement. *Id.* The situation here is analogous.

While Plaintiffs insist that the use of the helicopters is not necessary for the administration of the area, but merely desirable to enable access to repair a privately-owned dam, the Service views the matter differently. In considering the

Project, the Forest Service used the minimum tool principle provided for under the

Selway-Bitterroot Wilderness Plan. In this process, the Forest Service identified

the minimum management actions necessary to correct a given problem, and then

implemented those actions using the methods and equipment that accomplish the

objective with the least impact on physical, biological and social characteristics of

wilderness. The Forest Service found that the proposed helicopter use met all of

these requirements.

In the past the Forest Service has denied helicopter access to the Fred Burr

dam site on the grounds that such access failed to meet the requirements of the

Wilderness Act. In denying the helicopter access to close the Fred Burr dam

headgate in 1973, the Forest Service stated:

> [w]e are in full sympathy with the hardships and difficulties you
> describe in foot-travel access to this lake at this time of the year.
> However, it would not, in our judgment, be playing fair with the
> intent of the Wilderness Act to characterize this difficulty as an
> emergency or a special situation which justifies an exemption to the
> constraints imposed by Wilderness classification[.]

The current Project and potential problems are distinguishable from the

1973 request. Here, the Forest Service determined that the need to replace the

catwalk is a special situation that gives rise to the exception under the Wilderness

Act and that helicopter is the best way to achieve the purposes of that Act. In *Wolf*

*Recovery*, the plaintiffs argued that the use of a helicopter was not "necessary" because the Nez Perce had caught and collared wolves using leg-hold traps and that wolf populations thrived without collaring. 692 F. Supp. 2d at 1268. The court rejected both of these contentions, finding that the scattering of traps around the wilderness "would seem to denigrate the wilderness experience as much as helicopter" and that data collection was important to overall wolf management practices. *Id.* Plaintiffs argue that such action justifies helicopter use here because it is not necessary, as the repairs could be performed by bringing the materials in by packstock. However, Defendants have demonstrated that the use of packstock or foot access would denigrate the wilderness by requiring significant and permanent changes and expansions to the existing trail. The use of a helicopter flight does not suffer from these drawbacks. Thus, the agency determined helicopter use is the minimum tool necessary to meet the administration of the area.

### 3.    Similarly Situated Inholdings

Under the Wilderness Act, valid occupancies are only afforded "ingress and egress . . . by means which have been or are being customarily enjoyed with respect to other areas similarly situated." 16 U.S.C. § 1134(b). As the agency administering the Selway-Bitterroot Wilderness, the Forest Service is responsible

for "prescrib[ing] routes of travel to and from the surrounded occupancies, the mode of travel, and other conditions reasonably necessary to preserve National Forest Wilderness." 36 C.F.R. § 293.13.

It is uncontested that the use of a helicopter to transport equipment is consistent with access to similarly situated properties. Defendants point to the Running Creek Ranch, Selway Lodge, and North Star Ranch, similarly situated occupancies each completely surrounded by Wilderness, each having their own airstrips with unlimited aircraft access. The record also indicates that other dams within the Selway-Bitterroot Wilderness have utilized motorized access in the past on a case-by-case basis, including Bass Lake, Canyon Lake, Wyant Lake, Mill Lake, Big Creek Lake, Carlton Lake, Tin Cup, Tamarack, Holloway, Blodgett, and Sear Lake. Plaintiffs argue some of these properties are private inholdings owned in fee simple so they are not similarly situated under the Act. Even if this is true, the argument fails to account for the mechanical property access granted to the many dams similarly situated that do not have this distinguishing feature.

The Forest Service did not violate the Wilderness Act when it determined that Fred Burr High Lake Inc. was entitled to access its dam by means that are consistent with access granted the above-listed similarly situated properties, which has been shown to include helicopter access.

## B.    NEPA

NEPA is a purely procedural statute, intended to protect the environment by fostering informed agency decision-making. *See Cal. ex. rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d 999, 1012 (9th Cir. 2009). NEPA "does not mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *High Sierra Hikers Assn.*, 390 F.3d at 639 (citation and internal quotation marks omitted).

### 1.    Reasonable Alternatives

NEPA requires an agency to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E). This alternatives provision applies whether an agency prepares an environmental impact statement (EIS) or an environmental assessment (EA). *N. Idaho Community Action Network v. U.S. Dept. of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1245 (9th Cir. 2005)). "However, an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." *Id.* Under an EIS, an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," *see* 40 C.F.R. § 1502.14(a), while under an EA, an agency is only

required to include a brief discussion of reasonable alternatives, *see* 40 C.F.R. §

1508.9(b); *N. Idaho Community Action Network*, 545 F.3d at 1153.

Whether the Forest Service considered "appropriate and reasonable

alternatives," first requires a look to the stated purpose of the Project. *Native*

*Ecosystems Council*, 428 F.3d at 1246-47 (citing *Idaho Conserv. League v.*

*Mumma*, 956 F.2d 1508, 1520 (9th Cir. 1992)). Whether an alternative is

reasonable and should have been considered depends on the "nature and scope of

the proposed action." *Idaho Conserv. League*, 956 F.2d at 1520) (quoting *St. of*

*Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)). The "Purpose and Need" section

of the EA at issue here states:

> The purpose of this proposal is to authorize [FBHLI] adequate access
> to their facilities and to prescribe terms and conditions related to this
> access and their subsequent work on the facilities necessary to protect
> the National Forest.

(EA at 2.) Alternatives that do not advance the purpose of the Project will not be

considered reasonable or appropriate. *Native Ecosystems Council*, 428 F.3d at

1247.

An agency does not need to consider every available alternative. *Bering*

*Strait Citizens for Responsible Resource Dev. v. U.S. Army Corps of Engrs.*, 524

F.3d 938, 955 (9th Cir. 2008). "An agency need not discuss alternatives similar to

alternatives actually considered, or alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Id.* (internal quotation marks and citation omitted)*; see also Native Ecosystems Council*, 428 F.3d at 1249 (finding that the Forest Service did not have to consider the plaintiff's proposed alternative because it was substantially similar to the "no action" alternative already considered); *Westland Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) ("Nor is an agency required to undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences." (internal quotation marks and citation omitted)).

Although an EA was prepared for the Project, the Forest Service issued a FONSI, deeming an EIS unnecessary. The EA included analysis of three alternatives: Alternative 1-No Action, Alternative 2-Proposed Action, and Alternative 3-Non-mechanized, non-motorized Action. Plaintiffs insist that the Forest Service, in addition to failing to thoroughly evaluate Alternative 3, should have considered at least two more alternatives: a non-motorized plan created by the dam owners and the non-motorized plan suggested through public comments.

The discussion of Alternative 3 was reasonable. The Forest Service acknowledged that the non-motorized alternative "provides the owner and

operation of [the dam] with reasonable access to meet their legal responsibilities to maintain their facilities according to state and federal safety regulations." (EA at 17.) However, the EA goes on to state that to implement this alternative, "trail improvements . . . would result in long term changes to the trail's Opportunity Class objectives." (*Id.*) The Service also noted concerns regarding the safety of packing in the materials. (*Id.* at 4.) It engaged in a reasonable discussion of Alternative 3 resulting in its decision not to adopt it.

Requiring the Forest Service to have the dam owners develop another non-motorized plan would be redundant. Such an alternative would either be substantially similar to or result in substantially similar consequences as the existing Alternative 3. As seen in *Native Ecosystems Council* and *Bering Strait Citizens*, such duplicative analysis is not required by NEPA. Similarly, NEPA does not require the Forest Service to analyze all possible alternatives, including those that are considered infeasible or ineffective. *See Bering Strait Citizens for Responsible Resource Dev.*, 524 F.3d at 955. The Forest Service determined that a backpack alternative would not be appropriate as it was infeasible and ineffective to achieve the goals of the Project.

By its consideration of Alternatives 1 through 3, the Forest Service met its statutory and regulatory duty to prepare and discuss reasonable alternatives for the

Project.

## 2.    Cumulative Effects

Plaintiffs next claim the Forest Service also failed to properly analyze the

cumulative effects of the Project. The scope of the cumulative effects statement in

the EA is the "Fred Burr Creek Drainage and Vicinity." (Appendix E at 24.)

Plaintiffs contend that the Forest Service acted arbitrarily and capriciously by not

fully considering the cumulative impact of multiple projects using motorized

vehicles and equipment in the Bitterroot National Forest and the wilderness as a

whole. The government again takes the reasonable position that the effect of the

Project would be isolated, transitory, and insignificant and would not accumulate

with impacts from other projects within the Fred Burr drainage and thus would not

contribute to a collectively adverse effect on the Wilderness as a whole.

A "cumulative impact" is defined as

the impact on the environment which results from the incremental
impact of the action when added to other, past, present, and
reasonably foreseeable future actions regardless of what agency
(Federal or non-Federal) or person undertakes such other actions.
Cumulative impacts can result from individually minor but
collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Analysis of cumulative impacts "must be more than

perfunctory; it must provide a useful analysis of the cumulative impacts of past,

present and future actions." *Bering Strait Citizens for Responsible Resource Development*, 524 F.3d at 954 (quoting *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgt.*, 387 F.3d 989, 993-94 (9th Cir 2004) (internal quotation marks and citation omitted)). The agency "must do more than just catalogue relevant past projects in the area." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006) (internal quotation marks and citation omitted)).

An agency generally has the discretion to determine the geographic area considered under the cumulative effects analysis. *Selkirk Conserv. Alliance v. Forsgren*, 336 F.3d 944, 958 (9th Cir. 2003). It "must at least have considered cumulative effects in creating the boundaries of its analysis." *Selkirk Conserv. Alliance*, 336 F.3d at 958; *see also Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1071 (9th Cir. 2002) (finding that the NEPA requirements were met when the agency provided justification for its determination of the scope of its cumulative effects review, even if that review was limited in geographic area). If the project at issue is determined to have virtually no effect on cumulative impacts, it is unnecessary for the agency to detail other actions. *See Nw. Envtl. Advocates v. Natl. Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006) ("Because the [EIS] concludes that the . . . project will have virtually no effect . . . detailed cataloguing of past projects' impact . . . would not have informed analysis

about alternatives presented for the current project, and was unnecessary."

(internal quotation marks and citation omitted)).

The Forest Service's determination that the Fred Burr drainage was the appropriate scope for examining the cumulative impacts of the Project is not in error. The agency specifically found that the impacts of the Project will be isolated and insignificant as justification for limiting the scope its analysis:

> Because of the ephemeral and geographically limited nature of this proposal's effects on the wilderness setting, there does not appear to be cumulative effects (overlapping in both time and space) with other past present or reasonable foreseeable actions.

(EA at 26.) The EA states the one-hour helicopter over-flight proposed by the Project will have an insignificant impact on only a small portion of the wilderness. The agency completed the requisite hard-look at cumulative impacts through its determination that the project will have little present impact and virtually no ongoing impact. This conclusion is sound and no further analysis is required under the law. *See Nw. Envtl. Advocates*, 460 F.3d at 1140.

### 3.    Access Standards

Plaintiffs allege the Forest Service conflated the legal standards applicable to inholdings and occupancies, in violation of NEPA. They claim the Forest Service inappropriately applied the adequate access guarantee of the Wilderness

Act in its consideration of the project, arguing that standard applies to private

inholdings and not occupancies, such as dams.

The Wilderness Act affords a specific right of adequate access to

inholdings—privately owned land completely surrounded by areas designated as

wilderness. 16 U.S.C. § 1134(a). This right to adequate access for inholdings does

not conflict with the Act's express delegation of regulatory authority to effectuate

access to occupancies in wilderness areas. Access guarantees set forth in the

Wilderness Act and ANILCA are discussed in detail in Part IV.A.1. *supra* and will

not be restated at length. Valid occupancies are guaranteed ingress and egress

pursuant to statute. *See* 16 U.S.C. § 1134(b). Inholdings are also afforded a right

of adequate access. *See id.* § 1134(a). ANILCA guarantees a right to access private

lands throughout the National Forest system. *See id.* § 3210(a).

The government correctly points out that there is no conflation of the

applicable standard. The EA clearly states that although FBHLI was then entitled

to access under a special use permit, it had applied for—and was entitled to—a

permanent easement. Thus, the government argues, the EA properly considered

access under both 36 C.F.R. §§ 251.110, 251.111 (access to inholdings) and 36

C.F.R. § 293.13 (access to valid occupancies).

That FBHLI's interest in the land would inevitably ripen from a valid

occupancy to an easement is not of consequence. In this instance, adequate access to the Project area is tantamount to the ingress and egress necessary to complete the work on the dam. The Forest Service's determination that authorizing the Project comports with affording FBHLI adequate access to the dam is not invalid, as the owners of the dam were inevitably due an easement under 43 U.S.C. § 1761. The EA properly considered both standards and found both the adequate access and ingress and egress provisions of the law support authorizing the Project.

Furthermore, any procedural error in the Service's consideration of the easement access standard prior to the grant of the easement is harmless. Courts exercise caution in finding an error nonprejudicial in the context of agency action. *See Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005) (citations omitted). Here, a finding of harmless error is appropriate because the Forest Service's mistake, if any, had no bearing on the procedure it used or the substance of the decision it reached. *See Buschmann v. Schweiker*, 676 F.2d 352, 358 (9th Cir. 1982) (quoting *Braniff Airways v. C.A.B.*, 379 F.2d 453, 461 (D.C. Cir. 1967)). If anything, the Forest Service engaged in more process here than necessary by considering both the standard applicable to inholdings and the standard applicable to occupancies. Plaintiffs present no procedural defect that would be cured by requiring the Agency to reconsider its decision now that the easement has been

issued. Given the inevitability of the easement, the outcome was not affected by the dual track analysis the agency engaged in here.

### C. NFMA

NFMA creates a two-step process for the management of national forests. *Neighbors of Cuddy Mt.*, 303 F.3d at 1076. The Forest Service must develop a Land Resource Management Plan for each unit of the National Forest System. 16 U.S.C. § 1604(a). "[A]fter a forest plan is developed, all subsequent agency action, including site-specific plans such as the [Project], must . . . be consistent with the governing [forest management] plan." *Sierra Forest Legacy*, 646 F.3d at 1188 (internal quotation marks and citation omitted); *see also* 16 U.S.C. § 1604(I).

The current forest management plan for the Wilderness is the Selway-Bitterroot Wilderness Plan. The Wilderness Plan forbids motorized equipment and other non-conforming activities in the Wilderness area unless it can be demonstrated that it is the only feasible means of accomplishing necessary maintenance. It also forbids motorized means for accomplishing routine maintenance, stating "[r]outine maintenance such as replacing log booms . . . will be performed by non-motorized means." (Amend. 7-6 at 58.)

Plaintiffs contend the Forest Service violated NFMA by approving the Project without complying with Amendment 7, which disallows the use of

motorized means for accomplishing routine maintenance. Defendants insist that the log boom would be installed using non-motorized means and that the Project does not qualify as "routine maintenance" because it involves bringing in a new cable to the site, which is atypical maintenance.

The Project activities of delivering a cable for the log boom and replacing the catwalk do not fall under the category of "routine maintenance." Because the Forest Service determined that the use of a helicopter was the feasible means to perform the repair work, most consistent with the Wilderness Act, such access conforms with the Wilderness Plan and does not violate NFMA. Plaintiff's read of the Forest Plan would require an alternative that is "feasible" only to the extent that it disrupts the wilderness character of the area more than alternatives, resulting in irreversible impacts to the landscape. This result is not required. The government's argument, positing that where an alternative is available with a comparatively slight impact on the wilderness, such alternative renders other options infeasible, is well-taken. The Forest Service's determination that the Project is appropriate and will have the least impact on wilderness is acceptable under the NFMA as it is consistent with the Forest Plan and the Wilderness Act.

## V. Conclusion

There is no genuine issue of fact in dispute and the government is entitled to judgment as a matter of law on Plaintiffs' claims its actions in approving the Project violated the Wilderness Act, NEPA, and NFMA. The Forest Service's approval of the project complies with the law and will not be set aside. The one-hour helicopter over-flight proposed by the Project supports the Forest Service's mandate and is consistent with the purpose of the Wilderness Act, NEPA, and NFMA.

Accordingly, IT IS ORDERED that Defendant's Motion for Summary Judgment, (doc. 22) is GRANTED. Plaintiffs' Motion for Summary Judgment, (doc. 18), is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Second Motion for Preliminary Injunction is DENIED as MOOT.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment in favor of the United States and close this case.

DATED this 1st day of July, 2013.

DONALD W. MOLLOY, DISTRICT JUDGE
UNITED STATES DISTRICT COURT